# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) ) ) Chapter 11 ) |
| COMMERCECONNECT MEDIA HOLDINGS, INC., et al.,[1] | ) Case No. 09-12765 (BLS) ) ) Jointly Administered |
| Debtors. | ) ) Objection Deadline: August 31, 2009 at 4:00 p.m. (ET) ) Hearing Date: September 8, 2009 at 1:00 p.m. (ET) |

## APPLICATION BY THE DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING (I) EMPLOYMENT AND RETENTION OF MILLER BUCKFIRE & CO., LLC AS FINANCIAL ADVISOR AND INVESTMENT BANKER AND (II) WAIVER OF CERTAIN INFORMATION REQUIREMENTS OF LOCAL RULE 2016-2

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors" or "Cygnus") file this application (the "Application") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to sections 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy Code"), as supplemented by Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Code for the District of Delaware (the "Local Rules"), authorizing the employment and retention of Miller Buckfire & Co., LLC ("Miller Buckfire") as financial advisor and investment banker to the Debtors *nunc pro tunc* to the commencement of these chapter 11 cases. In support of the Application, the Debtors rely upon and incorporate by reference the Affidavit of Samuel Greene

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CommerceConnect Media Holdings, Inc. (1749), Cygnus Business Media, Inc. (0832), Cygnus New Business Launches, Inc. (0713) and Cygnus Interactive New Business Launches, Inc. (1283). The address for each of the Debtors is: 1233 Janesville Avenue, Fort Atkinson, WI 53538.

(the "Greene Affidavit,") annexed hereto as **Exhibit B**. In further support of the Application, the Debtors rely on the Affidavit of James Ogle in Support of First Day Motions (the "Ogle Affidavit") filed on August 3, 2009 [Docket No. 18] and respectfully represent as follows:

## Jurisdiction

1.     On the date hereof (the "Petition Date"), the Debtors commenced their respective bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). No creditors' committee has been appointed in the Chapter 11 Cases by the United States Trustee for the District of Delaware. The Debtors are continuing in possession of their respective properties and are operating their respective businesses, as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.     The statutory predicates for the relief sought herein are section 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014 and Local Rule 2014-1.

## Introduction

4.     As described in more detail below, the Chapter 11 Cases have been commenced to effectuate a negotiated out-of-court restructuring plan that has previously been agreed to by all but one of the Debtors' senior secured lenders, all of the Debtors' junior secured lenders, the holders of all of CommerceConnect Media Holdings, Inc.'s ("CCMH") Series A Preferred Stock and the holders of a majority in interest of CCMH's voting equity. The Debtors do not intend the Chapter 11 Cases to have any effect on the allowed claims of general unsecured creditors, but rather, to permit such claims to effectively "ride through" the Chapter 11 process and be paid in

full without any impact by the bankruptcy on the relative rights, obligations and defenses of the parties. While the Debtors had hoped to avoid the cost of the Chapter 11 Cases by restructuring consensually out-of-court, one (1) hold out senior lender has refused to consent, apparently seeking to extract further value from the companies or its co-lenders. For this reason, the Debtors were forced to modify the consensual restructuring into a prepackaged Chapter 11 plan of reorganization (the "Plan"). Approximately 96% of the Debtors' senior secured lenders and 100% of the Debtors' junior secured lenders have voted in favor of the Plan, representing approximately $200 million of the approximately $206 million in secured debt owed to these institutional creditors. The Debtors therefore commenced these Chapter 11 Cases to confirm the Plan, and will be seeking to do so expeditiously.

A.     The Debtors' Businesses.

5.     Cygnus is a leading business-to-business ("B2B") publisher and communications company, distributing content to diverse audiences in the construction, public safety, industrial and manufacturing, security, technology, transportation and aviation industries. Cygnus employs approximately 680 people, including 430 salaried and hourly employees and 250 independent contractors, all of whose livelihoods depend in some significant measure upon the successful continuation of the Debtors' business enterprise. These employees and independent contractors are essential to the Debtors' business operations and perform a variety of critical functions.

6.     Several magazines published by Cygnus have been published for more than 40 years. Cygnus' market-leading brands include *Qualified Remodeler*, *Firehouse*, *Equipment Today*, *Kitchen and Bath Design News*, and the *CPA Technology Advisor*. Cygnus' breadth of content is internationally-recognized, reaching millions of business professionals who rely on Cygnus' proprietary content to make critical business decisions. Cygnus reaches business professionals by utilizing three media platforms: publishing, interactive and expositions.

7. Publishing. Cygnus publishes 42 leading trade publications in 13 major markets, reaching over three million professionals, manufacturers and retail subscribers regularly. Cygnus' publications are staffed with award-winning, industry-recognized writers and editors.

8. Interactive. With 38 website destinations, Cygnus' interactive division is a leading online provider of essential news, information, utilities and e-commerce services to 13 unique markets, providing industry news and information to over two million B2B professionals annually. Cygnus offers its interactive customers a full complement of updated industry news and award-winning editorial as well as video, webinars, online catalogs, e-newsletters and digital supplements and editions. In 2008, Cygnus interactive websites generated over 180 million page views with nearly two million unique visitors per month.

9. Expositions. Cygnus' exposition division is a leader in producing industry expositions, consistently providing solutions for doing business successfully. It produces approximately 32 trade shows and events annually, managing hundreds of thousands of square feet for thousands of exhibitors and tens of thousands of attendees each year. Additionally, Cygnus is at the forefront in producing electronic show dailies which include broadcast components, and Cygnus also produces custom programming from expo clients for use at trade shows.

B. Economic Performance and Other Challenges.

10. Cygnus' capital structure is highly leveraged, with approximately $206 million in total funded secured debt (inclusive of accrued interest) as of June 30, 2009. Cygnus' funded secured debt consists primarily of (i) not less than $173 million of senior, first lien debt under a credit agreement (the "Prepetition Credit Agreement") dated as of July 13, 2004, having General Electric Capital Corporation ("GECC") as agent; and (ii) approximately $33 million of junior, second lien debt under a term loan dated as of July 13, 2004, having Barclays Bank PLC

("Barclays") as agent. In addition, Cygnus has issued approximately $81 million of Series A Redeemable Preferred Stock (as of June 30, 2009, including accretion), approximately $109,820 of Series B Preferred Stock (as of June 30, 2009), and approximately $4,252 of Series C Preferred Stock (as of June 30, 2009).

11. Based on 2008 EBITDA of $23 million, the total leverage ratio (secured debt) is approximately 8.9x and the aggregate leverage is 12.5x (including Series A but excluding Series B and Series C Preferred Stock).

12. Since the second quarter of 2008, Cygnus has been unable to meet its total leverage ratio covenants and has been in default under its financing agreements. The result of the covenant default was that lenders denied the company use of the $13 million of availability under the Prepetition Credit Agreement, and Cygnus' liquidity has become constrained. Cygnus has been unable to make regular debt service payments to either the senior secured lenders or junior secured lenders, and has been operating under a nonbinding forbearance from the lenders. Further, as a result of these events, Cygnus' credit rating has been downgraded by Moody's and Standard & Poor's.

13. Additionally, Cygnus faces certain challenges that are not specific to it, but rather are being seen across the B2B industry. In addition to decreased advertising arising from the current economic climate, the B2B industry specifically has undergone a fundamental change driven by enhanced functionality of online advertising and tools causing traditional advertisers to reduce their allocation of resources to B2B publications and increase spending in their marketing budgets on their own websites.

14. Finally, Cygnus has been negatively affected by the overall shift away from print media. Although Cygnus has three media platforms, the majority of the business is devoted to

and revenue is derived from print media. The management team continues to believe that in order to be more successful, the Cygnus model needs to continue to shift toward interactive media and away from print, providing the most appropriate balance for Cygnus' advertisers.

C.  Sale Efforts; Negotiations with Lenders.

15.  More than three years ago, the Board of Directors of Cygnus engaged a well-known, leading investment bank to conduct a process to broadly market the company. This marketing process was unsuccessful in producing a credible bid that satisfied the Board of Directors. After a change in management teams and approximately twelve months later, the Board of Directors retained a nationally recognized boutique investment bank focused on media companies to again market the company through a solicitation process where numerous parties were contacted. During this period Cygnus undertook a considerable internal restructuring designed to address the business challenges facing all print media companies.

16.  The second marketing process concluded with the leading party providing a bid that failed to satisfy the secured creditors of the company and would not provide a recovery for other constituents. As noted above, the sale processes occurred at a time when print media businesses were (and continue to be) in considerable upheaval, and when the economy as a whole has been subject to considerable decline.

17.  Due to these disappointing marketing process results, Cygnus engaged Miller Buckfire & Co., LLC ("Miller Buckfire") to assist the company's efforts to address its liquidity constraints and its overleveraged balance sheet. Miller Buckfire is an investment banking firm with considerable expertise in distressed scenarios, including ones such as those faced by the company where the value of a company is less than its secured debt.

18.     Miller Buckfire has performed a number of tasks simultaneously, including resoliciting the leading bidder noted above, soliciting interest from potential investors and strategic partners and conducting negotiations with Cygnus' secured lenders and preferred equity holders regarding an internal restructuring of the company's balance sheet. There have been a number of sit down meetings with and/or management presentations to interested parties and extensive negotiations with the senior secured and junior secured lenders.

19.     Unfortunately, the multiple sales processes did not produce a buyer who could or would purchase Cygnus for an amount necessary to satisfy even the company's senior secured debt. As a result, Miller Buckfire and Cygnus turned their attention to the various restructuring possibilities. After examining the options, including both a chapter 11 bankruptcy filing and an out-of-court restructuring, Miller Buckfire and Cygnus concluded that an out-of-court restructuring presented the most viable option for the Debtors, as it likely would have the least impact on the Debtors' going concern value, the lowest cost of implementation and potentially could be consummated more quickly than the other alternatives. These factors translated into the best potential return for the Debtors' stakeholders.

20.     The result is that Miller Buckfire and Cygnus developed, along with GECC, other senior lenders, Barclays, the holders of the Series A Preferred Stock and the holders of a majority in interest of the Debtors' voting equity, a proposed restructuring that would convert a large portion of the existing senior secured debt, and all of the existing junior secured debt, into equity and warrants, respectively (the "Out-of-Court Restructuring").

D.     Need for Relief.

21.     The Out-of-Court Restructuring was intensely negotiated over a series of months, among the Debtors, GECC, other senior lenders, Barclays, the holders of the Series A Preferred

Stock and the holders of a majority in interest of the Debtors' voting equity. Throughout the process, each of GECC and Barclays has been in nearly constant contact with the registered holders of the senior secured debt and junior secured debt. Information and documentation was made available in real time to all senior lenders, including, in the case of the senior secured lenders, through an on-line document database (*Intralinks*).

22. Until the week of July 13, 2009, the Out-of-Court Restructuring had been proceeding apace. As early as Monday of that week, all of the parties were hopeful that the Out-of-Court Restructuring would close on July 16, 2009, and in fact, the professionals had already begun to collect the signatures of the parties to the Out-of-Court Restructuring agreements when an unexpected obstacle arose.

23. On July 14, 2009, the Debtors were informed by GECC that one of the 21 holders of the not less than $173 million of senior, first lien debt, may refuse to consent to the Out-of-Court Restructuring. That holder, Genesis CLO 2007-2 Ltd. (the "Leichtman Fund"), a fund managed by Levine Leichtman Capital Partners ("Levine Leichtman"), holds approximately $6.4 million of the not less than $173 million of senior, first lien debt, which is less than 4% of the dollar amount of the claims in that class. Nonetheless, on an out-of-court basis, the Prepetition Credit Agreement requires unanimous consent of the holders to effectuate the transactions required. See Prepetition Credit Agreement, § 11.2(c).

24. From that time through the Petition Date, each of the Debtors, GECC and Barclays, and their respective professionals attempted to obtain Levine Leichtman's consent to the Out-of-Court Restructuring – with no success. Levine Leichtman's refusal to consent therefore made an out-of-court solution impossible. Given the foregoing factors, the Debtors determined that a chapter 11 prepackaged plan affords them the best option to preserve and

realize upon the value of the companies and is the only remaining option to implement the agreed upon restructuring.

25.     In consultation with their professionals, and after careful examination, the Debtors' Boards of Directors, the Debtors, GECC and Barclays determined that chapter 11, combined with the prepackaged Plan, is the best and most efficient way to maximize a return for the Debtors, their estates, and all parties-in-interest.    Additionally, on August 4, 2009 the Bankruptcy Court entered the *Interim Order (I) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Prepetition Lenders Pursuant to 11 U.S.C. §§ 361, 362 and 363 and (II) Scheduling the Final Hearing Pursuant to Bankruptcy Rule 4001* Docket No. 36] which, with the consent of GECC, allows the Debtors' the use of cash collateral to ensure that the Debtors will have sufficient liquidity to complete the Chapter 11 process and effectuate the Plan.

26.     Consistent with the terms of the Out-of-Court Restructuring, the Plan seeks to impair only the not less than $173 million of senior, first lien debt under a Prepetition Credit Agreement (Class 3), the approximately $33 million of junior, second lien debt (Class 4), any intercompany obligations (Class 6) and the existing equity interests in the Debtors (Class 7 and 8).  Holders of other secured claims and general unsecured claims will have their allowed claims reinstated, or, at the option of the Debtor, paid in full.  The result is that the Plan provides for no impairment of virtually all the going-concern obligations of the Debtors, as well as the conversion of a large portion of the existing senior secured debt, and all of the existing junior secured debt, to equity and warrants, respectively.  The conversion of debt to equity results in a greatly reduced debt service and a largely deleveraged balance sheet.

27.    On July 27, 2009, the Debtors solicited votes for or against the Plan from Class 3 and Class 4, the only Classes entitled to vote under the Plan. As noted above and contained in the voting declaration of Garden City Group[2] filed on the Petition Date [Docket No. 13], approximately 95% in number and approximately 96% in dollar amount of Class 3 creditors (all but the Leichtman Fund) voted to accept the Plan and 100% in number and dollar amount of Class 4 creditors have voted to accept the Plan. Class 7 and Class 8 creditors were not solicited as they are receiving no distributions on account of their claims/interests and are deemed to have rejected the Plan.

28.    The Plan that has been overwhelmingly approved by the voting classes, as well as the cash collateral agreement between GECC and the Debtors, are intended to allow the Debtors to transition through bankruptcy as smoothly and as quickly as possible. The Debtors' publications, interactive web site and expositions should be virtually unaffected. Further, out of an abundance of caution, the Debtors sought, and received from the Bankruptcy Court, approval as part of their "first day motions" relief which will allow the Debtors' obligations to employees, customers and critical vendors to be honored in the ordinary course of business until such time as the Plan is confirmed and the obligations reinstated.

29.    The Chapter 11 Cases have therefore been instituted to enable the Debtors to effectively take these steps and otherwise maximize the value of their assets for the benefit of the Debtors, their employees, customers, creditors and other parties in interest.

30.    On August 4, 2009, the Bankruptcy Court approved various "first day" relief, which included, among other relief, authorization for the Debtors to continue their cash management system, to continue their customer programs, to pay critical vendors and to pay

---

[2] The Garden City Group is the Debtors' Claims, Noticing and Balloting Agent.

their employees' wages and salaries, all in the ordinary course of business. This relief ordered by the Bankruptcy Court will continue to allow the Debtors to operate their businesses in the ordinary course during these Chapter 11 Cases. During the first day hearing the Court scheduled the Plan confirmation hearing for September 8, 2009 at 1:00 p.m. (prevailing Eastern time), at which time the Bankruptcy Court will consider confirming the Debtors' joint pre-packaged chapter 11 Plan of Reorganization and related matters.

## Relief Requested

31.    By this Application, the Debtors seek entry of an order, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, (a) authorizing the employment and retention of Miller Buckfire as financial advisor and investment banker to the Debtors in these chapter 11 cases, effective as of the Petition Date and pursuant to the terms and conditions of the letter agreement between the Debtors and Miller Buckfire, dated September 26, 2008 (the "Engagement Letter"), a copy of which is annexed hereto as Exhibit C and incorporated by reference herein, as modified by the proposed retention order, (b) approving the terms of Miller Buckfire's employment, including the proposed fee structure and indemnification provisions, set forth in the Engagement Letter, as modified by the proposed retention order and (c) granting such other and further relief as the Court deems appropriate.

## Miller Buckfire's Qualifications

32.    Miller Buckfire is an independent firm that provides strategic and financial advisory services in large-scale corporate restructuring transactions. Miller Buckfire is principally owned and controlled by Henry S. Miller and Kenneth A. Buckfire and by the employees of Miller Buckfire. Miller Buckfire currently has approximately 65 employees.

33.    Miller Buckfire's professionals have extensive experience in providing financial advisory and investment banking services to financially distressed companies and to creditors,

equity holders and other constituencies in reorganization proceedings and complex financial restructurings, both in- and out-of-court. For instance, Miller Buckfire's professionals are providing or have provided financial advisory, investment banking, and other services in connection with the restructuring of numerous companies: Acterna Corporation; Aerovías Nacionales de Colombia S.A.; Allied Holdings, Inc.; Amtrol Inc.; Anchor Danly Company; Applied Extrusion Technologies, Inc.; AT&T Latin America; Aurora Foods Inc.; Autocam Corporation; Avado Brands, Inc.; Birch Telecom, Inc.; Black Diamond Mining Company, LLC; Bruno's Inc.; Burlington Industries; Calpine Corporation; Cambridge Industries; Carmike Cinemas; Celotex Corporation; Centerpoint Energy; Citation Corporation; CMS Energy Corporation; Criimi Mae, Inc.; CTC Communications; Dana Corporation; Delta Air Lines, Inc.; Dow Corning Corporation; Drypers, Inc.; Dura Automotive Systems, Inc.; EaglePicher Holdings Inc.; Exide Technologies; Eurotunnel Group; Favorite Brands International Inc.; FLYi, Inc.; Foamex International; Focal Communications Corporation; FPA Medical Management; Gate Gourmet; General Growth Properties, Inc.; Grand Union Co.; Greatwide Logistics Services, Inc.; Grupo TMM; Hines Horticulture, Inc.; Horizon Natural Resources Company; Huntsman Corporation; ICG Communications; ICO Global Communication, Ltd.; IMPATH Inc.; Interstate Bakeries Corporation; J.L. French Automotive Castings; Kmart Corporation; Lear Corporation; Level (3) Communications; Laidlaw, Inc.; Loewen Group; McLeodUSA; Meridian Technologies Inc.; Mervyn's Inc.; Micro Warehouse; Mirant Corp.; Montgomery Ward & Co.; National Airlines; Oakwood Homes; Pacific Crossing Limited; Pathmark Stores, Inc.; Pegasus Satellite Communications; PennCorp Financial Group, Inc.; Pioneer Companies; PSINet; Polaroid Corporation; Polymer Group, Inc.; Progressive Molded Products Inc.; SI Corporation; The Spiegel Group; Sunbeam Corporation; Stolt-Nielsen S.A.; Stolt-Offshore S.A.; TECO Energy;

Trans World Airlines; U.S. Office Products; Vulcan, Inc.; and Women First Healthcare, Inc. Miller Buckfire's professionals are also providing or have provided mergers and acquisitions advisory services in connection with whole or partial company sale transactions involving companies across a wide range of industries, including Atwood Mobile Products (Dura Corporation); Aurora Foods; Burlington Industries; Calpine Corporation; Cambridge Industries; Career Blazers; Conversent Communications; Country Road Communications; Dana Corporation; Focal Communications; Global Valley Networks; IMPATH; Pegasus Broadcast Corporation; Pegasus Communications; PSINet; and Polaroid Corporation.

34.  Since September 26, 2008, Miller Buckfire has provided the following services, among others, to the Debtors in connection with their restructuring efforts:

a.  familiarized itself with the assets and operations of the Debtors;

b.  analyzed the current liquidity and projected cash flows of the Debtors;

c.  prepared various analyses with regard to liquidity, debt capacity and valuation;

d.  examined and sought to implement potential strategic alternatives to address the liquidity restraints and capital structure issues facing the Debtors;

e.  assisted the Debtors in negotiating confidentiality agreements for parties in interest, gathering and developing due diligence information for such parties, structuring and participating in due diligence meetings and conference calls with parties in interest and their respective advisors;

f.  engaged in negotiations with the Debtors' various prepetition first lien lenders, second lien lenders and preferred stockholders regarding potential out-of-court restructuring alternatives;

g.  facilitated meetings and conference calls between the Debtors' prepetition first lien and second lien lenders in a effort to garner support and reach agreement on a consensual restructuring plan of the Debtors; and

h.  participated in meetings with the Debtors' board of directors and the various parties in interest regarding both in-court and out-of-court alternatives; and

i.  assisted the Debtors and their advisors with developing the process, procedures and documentation for a plan of reorganization.

35.     In providing professional services to the Debtors, Miller Buckfire has worked closely with the Debtors' management and has become well-acquainted with the Debtors' businesses, capital structure, financial affairs and related matters.   The experience Miller Buckfire gained before the Petition Date will facilitate the provision of the services required by the Debtors in these chapter 11 cases.   The Debtors believe that Miller Buckfire is both well qualified and uniquely able to represent them in their chapter 11 cases in an efficient and timely manner.

## Scope of Services

36.     In accordance with the terms of the Engagement Letter, at the request and direction of the Debtors, Miller Buckfire will perform the following investment banking services, among others, to the extent they are desired or necessary:[3]

a.      familiarize itself with the business, operations, properties, financial -condition and prospects of the Debtors;

b.      provide general financial advisory and investment services, including, if the Debtors determine to undertake a Restructuring, Financing and/or Sale, advising and assisting the Debtors in structuring and effecting the financial aspects of such a transaction or transactions;

c.      provide financial advice and assistance to the Debtors in developing and seeking approval of a plan of reorganization;

d.      provide financial advice and assistance to the Debtors in structuring any new securities to be issued under a plan of reorganization;

e.      assist the Debtors and/or participate in negotiations with entities or groups affected by a plan of reorganization;

f.      participate in hearings before the Bankruptcy Court with respect to the matters upon which Miller Buckfire has provided advice, including, as relevant, coordinating with the Debtors' counsel with respect to testimony in

---

[3]      The description of the Engagement Letter is a summary.  To the extent that this Application and the terms of the of the Engagement Letter are inconsistent, the terms of the Engagement Letter control. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Engagement Letter.

connection therewith;

g.    assist the Debtors and/or participate in negotiations with potential Investors;

h.    provide financial advice and assistance to the Debtors in connection with a Sale, identify potential acquirers and, at the Debtors' request, contact such potential acquirers; and

i.    assist the Debtors and/or participate in negotiations with potential acquirers.

37.    Miller Buckfire has stated its desire and willingness to act in these chapter 11 cases and to render the necessary professional services as financial advisor and investment banker for the Debtors. The Debtors require Miller Buckfire's advice and services in order to maximize the value of their estates. All of the services that Miller Buckfire has and will provide to the Debtors will be undertaken at the request of the Debtors and will be appropriately directed by the Debtors so as to avoid duplicative efforts among the professionals retained in the case, including Zolfo Cooper, Miller Buckfire and Zolfo Cooper are being retained to perform distinct functions. Miller Buckfire is being retained to provide general financial advisory and investment banking services, including structuring, evaluating and assisting with the consummation of a financial restructuring and any related financing(s) and/or sale transaction(s), while Zolfo Cooper is being retained to serve as operational advisors and interim management. Miller Buckfire has agreed with the Debtors to use reasonable efforts to coordinate with Zolfo Cooper and the Debtors' other retained professionals to avoid the unnecessary duplication of services.

## Compensation

38.    As more fully described in the Engagement Letter, and subject to the Court's approval, the Debtors have agreed to pay the following compensation to Miller Buckfire in consideration of the services to be performed in these chapter 11 cases:

a.    Monthly Advisory Fee. A Monthly Advisory Fee of $150,000 per month; provided that fifty percent (50%) of all Monthly Advisory Fees paid to Miller Buckfire beginning in February 2009 and (100%) of all Monthly Financial

Advisory Fees paid to Miller Buckfire beginning in October 2009 (to the extent applicable) will be credited (without duplication) against any Restructuring Transaction Fee, Sale Transaction Fee or Financing fee payable to Miller Buckfire pursuant to the Engagement Letter.

b. Restructuring Transaction Fee. If the Debtors consummate a Restructuring, Miller Buckfire is entitled to a Restructuring Transaction Fee of $1,600,000, payable at the closing of such Restructuring.

c. Sale Transaction Fee. If the Debtors consummate a Sale, Miller Buckfire is entitled to a Sale Transaction Fee of $1,600,000, payable at the closing of such Sale.

d. Higher of Fees: If the Debtors consummate a Sale and a Restructuring, Miller Buckfire shall receive the higher of the applicable Sale Transaction Fee and Restructuring Transaction Fee, but in no event shall receive both fees.

39. Additionally, the Debtors have agreed to reimburse Miller Buckfire for its reasonable expenses incurred in connection with the provision of services, such as travel and other reasonable out-of-pocket expenses (including all reasonable fees, disbursements and other charges of Miller Buckfire's counsel).

40. Miller Buckfire has obtained valuable institutional knowledge of the Debtors' businesses and financial affairs as a result of providing services to the Debtors prior to the Petition Date. The Debtors submit that Miller Buckfire is both well qualified and uniquely able to perform these services and assist the Debtors in these chapter 11 cases. Moreover, the Debtors believe that without the skills and services of Miller Buckfire, their ability to reorganize would be hampered.

41. The Fee Structure is consistent with Miller Buckfire's normal and customary billing practices for comparably sized and complex cases, both in- and out-of-court, involving the services to be provided in these cases.

42. Miller Buckfire and the Debtors believe that the foregoing compensation arrangements are both reasonable and market-based. In determining the level of compensation to

be paid to Miller Buckfire and its reasonableness, the Debtors compared Miller Buckfire's proposed fees with the range of investment banking fees in other large and complex chapter 11 cases. The Debtors found Miller Buckfire's proposed fees to be reasonable and within the range of other comparable transactions.

43. To induce Miller Buckfire to do business with the Debtors in bankruptcy, the compensation structure described above was established to reflect the difficulty of the extensive assignments Miller Buckfire expects to undertake and the potential for failure.

44. Although Miller Buckfire does not charge for its services on an hourly basis, Miller Buckfire will maintain records in support of any actual and necessary costs and expenses incurred in connection with the rendering of its services in these cases. Miller Buckfire requests that it be permitted to file time records in one half (.5) hour increments. Accordingly, by this Application, the Debtors are seeking on behalf of Miller Buckfire, a waiver pursuant to Local Rule 2016-2(g) of the requirement to bill activities in one-tenths (.1) of an hour.

45. Miller Buckfire's strategic and financial expertise as well as its capital markets knowledge, financing skills, restructuring capabilities and mergers and acquisitions expertise, some or all of which may be required by the Debtors during the term of Miller Buckfire's engagement hereunder, were important factors in determining the Fee Structure, and the Debtors believe that the ultimate benefit to the Debtors of Miller Buckfire's services hereunder cannot be measured by reference to the number of hours to be expended by Miller Buckfire's professionals in the performance of such services.

46. In addition, the Fee Structure has been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of Miller Buckfire and its professionals hereunder, and in the light of the fact that such commitment may foreclose

other opportunities for Miller Buckfire and that the actual time and commitment required of Miller Buckfire and its professionals to perform its services hereunder may vary substantially from week to week or month to month.

47.     In sum, in the light of the foregoing and given the numerous issues which Miller Buckfire may be required to address in the performance of its services hereunder, Miller Buckfire's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Miller Buckfire's services for engagements of this nature both out-of-court and in a chapter 11 context, the Debtors believe that the Fee Structure is market-based and fair and reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.

48.     Accordingly, as more fully described below, the Debtors believe that the Court should approve Miller Buckfire's retention subject to the standard of review set forth in section 328(a) of the Bankruptcy Code and that Miller Buckfire's compensation should not be subject to any additional standard of review under section 330 of the Bankruptcy Code.

49.     As set forth in the Greene Affidavit, Miller Buckfire has not shared or agreed to share any of its compensation from the Debtors with any other person, other than as permitted by section 504 of the Bankruptcy Code.

**Indemnification and Limitation of Liability**

50.     The Engagement Letter further provides that the Debtors will indemnify, hold harmless and defend Miller Buckfire and its affiliates and its respective directors, officers, members, managers, shareholders, employees, agents and controlling persons and its respective successors and assigns (collectively, the "Indemnified Parties") under certain circumstances (such indemnification obligation being referred to as the "Indemnification Provisions"), which provisions are attached to and made a part of the Engagement Letter. These are standard

provisions, both in chapter 11 cases and outside chapter 11, and, as modified by the proposed retention order, reflect the qualifications and limits on the indemnification provisions that are customary in Delaware and other jurisdictions.

51.     The Debtors and Miller Buckfire believe that the Indemnification Provisions are customary and reasonable for financial advisory and investment banking engagements, both out-of-court and in Chapter 11 cases.  See, e.g., In re Mervyn's Holdings, LLC, Case No. 08-11586 (KG) (Bankr. D. Del. July 29, 2008) (authorizing retention of Miller Buckfire on similar terms); In re Hines Horticulture, Inc., Case No. 08-11922 (KJC) (Bankr. D. Del. August 20, 2008) (same); In re Dura Automotive Systems, Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. October 30, 2006) (same); In re FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D. Del. January 17, 2006) (same); In re Foamex International, Inc., Case No 05-12685 (PJW) (Bankr. D. Del. October 17, 2005) (same); In re Greatwide Logistics Services, Inc., Case No 08-12430 (PJW) (Bankr. D. Del. October 20, 2008) (same); In re Oakwood Homes Corporation, Case No. 02-13396 (PJW) (Bankr. D. Del. July 21, 2003) (same); In re CTC Communications Group, Inc., Case No. 02-12873 (PJW) (Bankr. D. Del. Nov. 15, 2002) (same).

52.     The Indemnification Provisions are similar to other indemnification provisions that have been approved by this Court and other bankruptcy courts.  See, e.g., In re Tropicana Entertainment, LLC, Case No. 08-10856 (KJC) (Bankr. D. Del. May 5, 2008) (authorizing indemnification of Lazard Freres & Co. LLC by debtors); In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. Apr. 26, 2007) (same); In re Comdisco, Inc., Case No 02-C-1174 (N.D. Ill. September 23, 2002) (affirming order authorizing indemnification of Lazard Freres & Co. LLC and Rothschild, Inc. by debtors and official committee of unsecured creditors); In re Joan & David Halpern, Inc., 248 B.R. 43 (Bankr. S.D.N.Y. 2000) (overruling

U.S. Trustee's objection to indemnity provision); In re United Artists Theatre Company, Case No. 00-3514 (SLR) (Bankr. D. Del. Dec. 1, 2000) (authorizing indemnification of Houlihan, Lokey by debtors).

53.　　The terms and conditions of the Engagement Letter, including the Indemnification Provisions, were negotiated by the Debtors and Miller Buckfire at arm's length and in good faith. The Debtors respectfully submit that the Indemnification Provisions contained in the Engagement Letter, viewed in conjunction with the other terms of Miller Buckfire's proposed retention, are reasonable and in the best interests of the Debtors, their estates and creditors in light of the fact that the Debtors require Miller Buckfire's services for a successful result in these cases. Accordingly, as part of this Application, the Debtors request that the Court approve the Indemnification Provisions as outlined in the Engagement Letter attached hereto as Exhibit C but subject to the modifications set forth in the proposed retention order.

### Basis for Relief

54.　　The Debtors seek approval of the Engagement Letter, including the Fee Structure, pursuant to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that the Debtors "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. . . ." 11 U.S.C. § 328(a).

55.　　Section 328 of the Bankruptcy Code permits the compensation of professionals, including financial advisors and investment bankers, on more flexible terms that reflect the nature of their services and market conditions, which is a significant departure from prior bankruptcy practice relating to the compensation of professionals. As the United States Court of

Appeals for the Fifth Circuit recognized in In re National Gypsum Co., 123 F.3d 861, 862 (5th Cir. 1997) (citations omitted):

> Prior to 1978, the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done. The uncertainty continues under the present § 330 of the Bankruptcy Code, which provides that the court award to professional consultants "reasonable compensation" based on relevant factors of time and comparable costs, etc. Under present § 328 the professionals may avoid that uncertainty by obtaining court approval of compensation agreed to with the trustee (or debtor or committee).

Id. at 862 (internal references omitted). Owing to this inherent uncertainty, courts have approved similar arrangements that contain reasonable terms and conditions under section 328 of the Bankruptcy Code. See, e.g., In re J.L. French Automotive Castings, Inc., No. 06-10119 (MFW) (Bankr. D. Del. March 24, 2006).

56.    The Fee Structure appropriately reflects the nature and scope of services to be provided by Miller Buckfire, Miller Buckfire's substantial experience with respect to investment banking services and the fee structures typically utilized by Miller Buckfire and other leading investment bankers, who do not bill their clients on an hourly basis.

57.    Similar fixed and contingency fee arrangements have been approved and implemented by courts in other large Chapter 11 cases in this Court and other courts. In re Mervyn's Holdings, LLC, Case No. 08-11586 (KG) (Bankr. D. Del. July 29, 2008) (authorizing retention of Miller Buckfire on similar terms); In re Hines Horticulture, Inc., Case No. 08-11922 (KJC) (Bankr. D. Del. August 20, 2008) (same); In re Dura Automotive Systems, Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. October 30, 2006) (same); In re FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D. Del. Jan. 17, 2006) (same); In re Foamex International, Inc., Case No. 05-12685 (PJW) (Bankr. D. Del. Oct. 17, 2005) (same); In re Oakwood Homes Corporation, Case No. 02-13396 (PJW) (Bankr. D. Del. July 21, 2003) (same); In re CTC Communications

-21-

Group, Inc., Case No. 02-12873 (PJW) (Bankr. D. Del. Nov. 15, 2002) (same); In re Tropicana Entertainment, LLC, Case No. 08-10856 (KJC) (Bankr. D. Del. May 5, 2008) (authorizing retention of Lazard Freres & Co. LLC by debtors); In re Covad Communications Group, Inc., Case No. 01-10167 (JJF) (Bankr. D. Del. Nov. 21, 2001) (authorizing retention of Houlihan Lokey with compensation subject to standard of review set forth in section 328(a)); In re Harnischfeger Industries, et al., Case No. 99-02171 (PJW) (Bankr. D. Del. Feb. 8, 2000) (authorizing retention of The Blackstone Group L.P. as investment bankers to debtors); In re Casual Male Corp., Case No. 01-41404 (REG) (Bankr, S.D.N.Y. March 18, 2001) (authorizing retention of Robertson Stephens, Inc., subject to section 328(a) standard of review).

58.     Furthermore, under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, a change was made to section 328(a) which is highlighted in bold below:

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, **on a fixed or percentage fee basis,** or on a contingent fee basis.

This change makes clear the ability of the Debtors to retain, with Bankruptcy Court approval, a professional on a fixed fee basis such as the Fee Structure with Miller Buckfire in this case.

59.     Notwithstanding approval of its Engagement Letter under section 328 of the Bankruptcy Code, Miller Buckfire will apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the procedures set forth in the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, as those procedures may be modified or supplemented by order of this Court.  Consistent with its ordinary practice and the practice of investment bankers in other chapter 11 cases whose fee arrangements are typically not hour-based, Miller Buckfire does not ordinarily maintain contemporaneous time records in one-tenth hour increments or provide or conform to a schedule

of hourly rates for its professionals. Therefore, Miller Buckfire should be excused from compliance with such requirements and should be required only to maintain such time records in one half (.5) hour increments.

60. In sum, the Debtors believe that the fee structure and other terms and conditions in the Engagement Letter, including the Indemnification Provision, are reasonable terms and conditions of employment and should be approved under section 328(a) of the Bankruptcy Code. The fee structure appropriately reflects (a) the nature and scope of the services to be provided by Miller Buckfire in these chapter 11 cases and work already performed by Miller Buckfire prior to the retention date and (b) the fee structures typically utilized by Miller Buckfire and other leading financial advisory and investment banking firms in and out of the chapter 11 context. In particular, the Debtors believe that the proposed fee structure creates a proper balance between fixed monthly fees and contingency fees based on a successful sale and/or restructuring.

## Disinterestedness

61. Miller Buckfire has informed the Debtors that, except as may be set forth in the Greene Affidavit, Miller Buckfire (a) has no connection with the Debtors, their creditors, equity security holders, or other parties in interest, or their respective attorneys and accountants, the United States Trustee or any person employed in the Office of the United States Trustee, in any matter related to the Debtors and their estates, (b) does not hold any interest adverse to the Debtors' estates and (c) believes it is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code.

62. Prior to the Petition Date, Miller Buckfire received total monthly fees of $1,500,000 for October 2008 through July 2009, pursuant to section 2(a) of the Engagement Letter. Miller Buckfire has also received $13,114.86 for expenses incurred from October 2008 through July 2009. To the extent that Miller Buckfire has received reimbursement for expenses

in excess of the amount actually incurred, Miller Buckfire will credit such overage to future incurred expenses. In total, Miller Buckfire received $1,513,114.86 prior to the Petition Date. The payments received before the Petition Date are described in more detail below:

| Date Received | Invoiced Amount | | | | Amount Received | | | |
|---|---|---|---|---|---|---|---|---|
| | Fee | Expenses | | Total | Fee | Expenses | | Total |
| 10/03/2008 | $150,000.00 | $0.00 | | $150,000.00 | $150,000.00 | $0.00 | | $150,000.00 |
| 11/04/2008 | $150,000.00 | $0.00 | | $150,000.00 | $150,000.00 | $0.00 | | $150,000.00 |
| 12/09/2008 | $150,000.00 | $8,658.34 | | $158,658.34 | $150,000.00 | $8,658.34 | | $158,658.34 |
| 01/08/09 | $150,000.00 | $799.08 | | $150,799.08 | $150,000.00 | $799.08 | | $150,799.08 |
| 02/05/09 | $150,000.00 | $604.51 | | $150,604.51 | $150,000.00 | $604.51 | | $150,604.51 |
| 03/10/09 | $150,000.00 | $868.67 | | $150,868.67 | $150,000.00 | $868.67 | | $150,868.67 |
| 04/13/09 | $150,000.00 | $993.67 | | $150,993.67 | $150,000.00 | $993.67 | | $150,993.67 |
| 05/07/09 | $150,000.00 | $992.10 | | $150,992.10 | $150,000.00 | $992.10 | | $150,992.10 |
| 07/07/09 | $150,000.00 | $160.51 | | $150,160.51 | $150,000.00 | $160.51 | | $150,160.51 |
| 07/29/09 | $150,000.00 | $37.98 | | $150,037.98 | $150,000.00 | $37.98 | | $150,037.98 |

63. The Debtors have been informed that Miller Buckfire will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new material facts or relationships are discovered or arise, Miller Buckfire will inform the Court.

**Notice**

64. The Debtors shall provide notice of this Application by facsimile and/or overnight mail to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions, as amended; (iii) counsel to the Debtors' prepetition secured lenders; and (iv) all parties who have

timely filed requests for notice under Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no further notice need be given.

## No Prior Request

30.    No previous application for the relief sought herein has been made to this or to any other Court.


*[Remainder of page intentionally left blank.]*

## Conclusion

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto as **Exhibit A**, granting the relief requested in the Application and such other and further relief as may be just or proper.

Dated: August 3, 2009
New York, New York

COMMERCECONNECT MEDIA HOLDINGS,
  INC.
CYGNUS BUSINESS MEDIA, INC.
CYGNUS NEW BUSINESS LAUNCHES, INC.
CYGNUS INTERACTIVE NEW BUSINESS
  LAUNCHES, INC.

By: _____
    James Ogle
    Chief Financial Officer

6286000

## EXHIBIT A

Proposed Order

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COMMERCECONNECT MEDIA HOLDINGS, INC., et al.,[1] | ) | Case No. 09-12765 (BLS) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

## ORDER AUTHORIZING (I) EMPLOYMENT AND RETENTION OF MILLER BUCKFIRE & CO., LLC AS FINANCIAL ADVISOR AND INVESTMENT BANKER AND (II) WAIVING CERTAIN INFORMATION REQUIREMENTS OF LOCAL RULE 2016-2

Upon the application (the "Application")[2] of the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" or "Cygnus") for an order, pursuant to sections 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy Code"), as supplemented by Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Code for the District of Delaware (the "Local Rules"), authorizing the employment and retention of Miller Buckfire & Co., LLC ("Miller Buckfire") as their financial advisor and investment banker on the terms set forth in the Engagement Letter, as modified by this Order, between the Debtors and Miller Buckfire *nunc pro tunc* to the commencement of these Chapter 11 Cases; and upon the Affidavit of Samuel Greene in support of the Application (the "Greene Affidavit") attached as **Exhibit B** to the Application; and the Court being satisfied

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CommerceConnect Media Holdings, Inc. (1749), Cygnus Business Media, Inc. (0832), Cygnus New Business Launches, Inc. (0713) and Cygnus Interactive New Business Launches, Inc. (1283). The address for each of the Debtors is: 1233 Janesville Avenue, Fort Atkinson, WI 53538.

[2] Capitalized terms used but not defined herein shall have the meanings set forth in the Application.

that Miller Buckfire is a "disinterested person" as such term is defined under section 101(14), as modified by section 1107(b), of the Bankruptcy Code; and upon the Declaration of James Ogle, Chief Financial Officer of Each of the Debtors, in Support of First Day Pleadings; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors and other parties in interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this Application is a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue of this proceeding and this Application in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; ; and the Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and due and proper notice of this Application having been provided; and it appearing that no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.      The Application is granted as set forth herein.

2.      Pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, the Debtors are authorized to employ and retain Miller Buckfire as financial advisor and investment banker under the terms of the Engagement Letter, as modified by this Order, and to pay fees to Miller Buckfire on the terms and at the times specified in the Engagement Letter.

3.      Miller Buckfire will file fee applications for interim and final allowance of compensation and reimbursement of expenses pursuant to the procedures set forth in sections 330 and 331 of the Bankruptcy Code and such Bankruptcy Rules as may then be applicable, from time to time, and such procedures as may be fixed by order of this Court.

5091208

4.     Notwithstanding the prior paragraph, the fees payable to Miller Buckfire pursuant to the Engagement Letter shall be subject to review pursuant to the standards set forth in section 328(a) of the Bankruptcy Code and shall not be subject to the standards set forth in section 330 of the Bankruptcy Code.

5.     Notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, any order of this Court or any guidelines regarding submission and approval of fee applications, Miller Buckfire and its professionals:  (a) shall only be required to maintain time records for services rendered postpetition in one half (.5) hour increments; and (b) shall not be required to provide or conform to any schedule of hourly rates.

6.     The Indemnification Provisions of the Engagement Letter are approved, subject to the following modifications:

   a.     Subject to the provisions of subparagraphs (c) and (d) below, the Debtors are authorized to Indemnify, and shall indemnify, Miller Buckfire, in accordance with the Engagement Letter, for any claim arising from, related to or in connection with their performance of the services described in the Engagement Letter;

   b.     Miller Buckfire shall not be entitled to indemnification, contribution or reimbursement pursuant to the Engagement Letter for services other than the services provided under the Engagement Letter, unless such services and the indemnification, contribution or reimbursement therefore are approved by the Court;

   c.     Notwithstanding anything to the contrary in the Engagement Letter, the Debtors shall have no obligation to indemnify any person, or provide contribution or reimbursement to any person, for any claim or expense that is either (i) judicially determined (the determination having become final) to have arisen primarily from that person's gross negligence or willful misconduct or (ii) for a contractual dispute in which the Debtors allege breach of Miller Buckfire's obligations under the Engagement Letter or (iii) settled prior to a judicial determination as to that person's gross negligence or willful misconduct, but determined by this Court, after notice and a hearing, to be a claim or expense for which that person should not receive indemnity, contribution, or reimbursement under the terms of the Engagement Letter as modified by this Order;

-3-

d.  If, before the earlier of (i) the entry of an order confirming a Chapter 11 plan in these Chapter 11 Cases (that order having become a final order no longer subject to appeal) and (ii) the entry of an order closing these Chapter 11 Cases, Miller Buckfire believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution and/or reimbursement obligations under the Engagement Agreement (as modified by this Order), including without limitation the advancement of defense costs, Miller Buckfire must file an application before this Court, and the Debtors may not pay any such amounts before the entry of an order by this Court approving the payment. This subparagraph (d) is intended only to specify the period of time under which the court shall have jurisdiction over any request for fees and expenses for indemnification, contribution or reimbursement, and not a provision limiting the duration of the Debtors' obligation to indemnify Miller Buckfire; and

e.  The Engagement Letter is amended to delete the proviso to the first sentence of the third paragraph of the Indemnification Provisions of the Engagement Letter.

7.  Notwithstanding any provision of the Engagement Letter to the contrary, to the extent this Court has jurisdiction over any matters arising out of or related to the Engagement Letter, such matter shall be heard in this court.

8.  To the extent this Order is inconsistent with any prior order or pleading with respect to the Application in these cases or the Engagement Letter, the terms of this Order shall govern.

9.  Notwithstanding the possible applicability of Rules 6004(h), 7062, and 9014 of the Bankruptcy Rules, or otherwise, the terms and provisions of this Order shall be immediately effective and enforceable upon its entry.

10. This Court shall retain jurisdiction over any matters arising from or related to the implementation or interpretation of this Order.

Dated: Wilmington, Delaware
       August ___, 2009

_____
THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

**Greene Affidavit**

5091208

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| COMMERCECONNECT MEDIA HOLDINGS, INC., et al.,[1] | ) ) | Case No. 09-12765 (BLS) |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |

**AFFIDAVIT OF SAMUEL GREENE IN SUPPORT OF THE APPLICATION BY THE DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING (I) EMPLOYMENT AND RETENTION OF MILLER BUCKFIRE & CO., LLC AS FINANCIAL ADVISOR AND INVESTMENT BANKER AND (II) WAIVER OF CERTAIN INFORMATION REQUIREMENTS OF LOCAL RULE 2016-2**

Pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Samuel Greene, under penalty of perjury, declares as follows:

1. I am a Managing Director of the firm Miller Buckfire & Co., LLC ("Miller Buckfire" or the "Firm"), which has its principal office at 153 East 53rd Street, 22nd Floor, New York, New York 10022. I am authorized to make this affidavit on behalf of Miller Buckfire and in support of the application (the "Application")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Cygnus") in the above-captioned Chapter 11 cases (the "Chapter 11 Cases" or "Cases") for entry of an order authorizing the Debtors to employ and retain Miller Buckfire as financial advisor and investment banker for the Debtors in connection

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: CommerceConnect Media Holdings, Inc. (1749), Cygnus Business Media, Inc. (0832), Cygnus New Business Launches, Inc. (0713) and Cygnus Interactive New Business Launches, Inc. (1283). The address for each of the Debtors is: 1233 Janesville Avenue, Fort Atkinson, WI 53538.

[2] Capitalized terms used, but not defined, herein shall have the same meanings as in the Application.

5091208

with the Chapter 11 Cases pursuant to that certain engagement letter, dated September 26, 2008, by and between Miller Buckfire and the Debtors (the "Engagement Letter"), a copy of which is attached as **Exhibit C** to the Application. Unless otherwise stated in this Affidavit, I have personal knowledge of the matters set forth herein.

## MILLER BUCKFIRE'S QUALIFICATIONS

2. Miller Buckfire is an independent firm that provides strategic and financial advisory services in large-scale corporate restructuring transactions. Miller Buckfire is principally owned and controlled by Henry S. Miller and Kenneth A. Buckfire and by the employees of Miller Buckfire. Miller Buckfire currently has approximately 65 employees.

3. Miller Buckfire's professionals have extensive experience in providing financial advisory and investment banking services to financially distressed companies and to creditors, equity holders and other constituencies in reorganization proceedings and complex financial restructurings, both in- and out-of-court. For instance, Miller Buckfire's professionals are providing or have provided financial advisory, investment banking, and other services in connection with the restructuring of numerous companies: Acterna Corporation; Aerovías Nacionales de Colombia S.A.; Allied Holdings, Inc.; Amtrol Inc.; Anchor Danly Company; Applied Extrusion Technologies, Inc.; AT&T Latin America; Aurora Foods Inc.; Autocam Corporation; Avado Brands, Inc.; Birch Telecom, Inc.; Black Diamond Mining Company, LLC; Bruno's Inc.; Burlington Industries; Calpine Corporation; Cambridge Industries; Carmike Cinemas; Celotex Corporation; Centerpoint Energy; Citation Corporation; CMS Energy Corporation; Criimi Mae, Inc.; CTC Communications; Dana Corporation; Delta Air Lines, Inc.; Dow Corning Corporation; Drypers, Inc.; Dura Automotive Systems, Inc.; EaglePicher Holdings

5091208

Inc.; Exide Technologies; Eurotunnel Group; Favorite Brands International Inc.; FLYi, Inc.; Foamex International; Focal Communications Corporation; FPA Medical Management; Gate Gourmet; General Growth Properties, Inc.; Grand Union Co.; Greatwide Logistics Services, Inc.; Grupo TMM; Hines Horticulture, Inc.; Horizon Natural Resources Company; Huntsman Corporation; ICG Communications; ICO Global Communication, Ltd.; IMPATH Inc.; Interstate Bakeries Corporation; J.L. French Automotive Castings; Kmart Corporation; Lear Corporation; Level (3) Communications; Laidlaw, Inc.; Loewen Group; McLeodUSA; Meridian Technologies Inc.; Mervyn's Inc.; Micro Warehouse; Mirant Corp.; Montgomery Ward & Co.; National Airlines; Oakwood Homes; Pacific Crossing Limited; Pathmark Stores, Inc.; Pegasus Satellite Communications; PennCorp Financial Group, Inc.; Pioneer Companies; PSINet; Polaroid Corporation; Polymer Group, Inc.; Progressive Molded Products Inc.; SI Corporation; The Spiegel Group; Sunbeam Corporation; Stolt-Nielsen S.A.; Stolt-Offshore S.A.; TECO Energy; Trans World Airlines; U.S. Office Products; Vulcan, Inc.; and Women First Healthcare, Inc. Miller Buckfire's professionals are also providing or have provided mergers and acquisitions advisory services in connection with whole or partial company sale transactions involving companies across a wide range of industries, including Atwood Mobile Products (Dura Corporation); Aurora Foods; Burlington Industries; Calpine Corporation; Cambridge Industries; Career Blazers; Conversent Communications; Country Road Communications; Dana Corporation; Focal Communications; Global Valley Networks; IMPATH; Pegasus Broadcast Corporation; Pegasus Communications; PSINet; and Polaroid Corporation.

    4.      Since September 26, 2008, Miller Buckfire has provided the following services, among others, to the Debtors in connection with their restructuring efforts:

-- 3 --

a. familiarized itself with the assets and operations of the Debtors;

b. analyzed the current liquidity and projected cash flows of the Debtors;

c. prepared various analyses with regard to liquidity, debt capacity and valuation;

d. examined and sought to implement potential strategic alternatives to address the liquidity restraints and capital structure issues facing the Debtors;

e. assisted the Debtors in negotiating confidentiality agreements for parties in interest, gathering and developing due diligence information for such parties, structuring and participating in due diligence meetings and conference calls with parties in interest and their respective advisors;

f. engaged in negotiations with the Debtors' various prepetition first lien lenders, second lien lenders and preferred stockholders regarding potential out-of-court restructuring alternatives;

g. facilitated meetings and conference calls between the Debtors' prepetition first lien and second lien lenders in a effort to garner support and reach agreement on a consensual restructuring plan of the Debtors; and

h. participated in meetings with the Debtors' board of directors and the various parties in interest regarding both in-court and out-of-court alternatives; and

i. assisted the Debtors and their advisors with developing the process, procedures and documentation for a plan of reorganization.

5. In providing professional services to the Debtors, Miller Buckfire has worked closely with the Debtors' management and has become well-acquainted with the Debtors' businesses, capital structure, financial affairs and related matters. The experience Miller Buckfire gained before the Petition Date will facilitate the provision of the services required by the Debtors in these chapter 11 cases. Accordingly, Miller Buckfire is both well qualified and uniquely able to represent the Debtors in their chapter 11 cases in an efficient and timely manner.

## MILLER BUCKFIRE'S DISINTERESTEDNESS

6. The Debtors have numerous creditors, equity holders and other parties with whom

they maintain business relationships. In connection with its proposed retention by the Debtors in these Cases, Miller Buckfire undertook to determine whether it had any conflicts or other relationships that might cause it not to be disinterested or to hold or represent an interest adverse to the Debtors. To check and clear potential conflicts of interest in these Cases, Miller Buckfire reviewed its client relationships to determine whether it had any relationships with the following entities (collectively, the "Potential Parties in Interest"):

a. the Debtors and certain of their affiliates;

b. significant first lien and second lien secured lenders;

c. significant preferred lenders;

d. significant equity holders;

e. the Debtors' largest unsecured trade creditors;

f. significant customers;

g. the Company's landlords, lessors, insurers and counterparties to significant executory contracts;

h. the Debtors' present and former officers and directors;

i. parties to significant litigation with the Debtors;

j. various government entities;

k. United States Trustee Employees;

l. the attorneys and other professionals that the Debtors have identified for employment in these Chapter 11 Cases;

m. other Professionals Retained by the Debtors; and

n. other significant parties in interest.

7. The identities of the Potential Parties in Interest were provided to Miller Buckfire by the Debtors and the Debtors' legal counsel.

8.     Miller Buckfire is an independent and privately-owned investment bank and financial advisory firm.  Miller Buckfire is wholly owned by MB Advisory Group, LLC ("MB Advisory"), a limited liability company organized under the laws of the State of Delaware.  The principal owner of MB Advisory is MB Capital Co., LLC ("MB Capital"), which is also a Delaware limited liability company.  MB Capital owns 90% of the membership interests in MB Advisory, and Sal. Oppenheim North America Corporate Finance Holding LLC ("Investor") owns the remaining 10%.  Investor is a Delaware limited liability company formed in 2007 by Sal. Oppenheim Jr. & Cie.KGaA ("Oppenheim"), a leading European private bank that provides investment banking and asset management services in various countries in Europe.  In March 2007, at the time Investor acquired its interest in MB Advisory, Miller Buckfire also entered into a Strategic Collaboration Agreement with Oppenheim.  Pursuant to that agreement, Miller Buckfire will work with Oppenheim to provide financial restructuring services to clients located in Germany, Austria and Switzerland.  Miller Buckfire and Oppenheim also will work together on potential cross-border M&A transactions and may from time to time act as joint advisors in such M&A transactions.  However, the Strategic Collaboration Agreement does not apply to the provision of investment banking and financial advisory services for restructuring purposes to clients in the United States.

9.     Investor and Oppenheim will have no involvement in Miller Buckfire's provision of services in these Chapter 11 Cases, and they will have no access to any of Miller Buckfire's records or other non-public information relating to this case.  Given their limited relationships, Miller Buckfire does not have access to Oppenheim's conflicts databases for purposes of the disclosures being made herein.  Miller Buckfire has, however, reviewed the lists of parties-in-

-- 6 --

interest provided by the Debtors to determine if Oppenheim or any affiliates of Oppenheim known to Miller Buckfire (based on a limited review of publicly available information) are parties-in-interest in these cases. To the best of my knowledge, information and belief, none of the parties-in-interest identified to Miller Buckfire are affiliated with Oppenheim or its affiliates.

10. Miller Buckfire does not believe that Investor's minority stake in MB Advisory, the strategic relationship between Miller Buckfire and Oppenheim, or Oppenheim's limited connections with potential parties-in-interest, are material to Miller Buckfire's work in this case.

11. An affiliate of Miller Buckfire serves as manager for an investment fund (the "Managed Fund"). The Managed Fund is intended principally for investments by third parties unrelated to Miller Buckfire. However, such investors also may include financial institutions (some of which may be parties in interest in the Chapter 11 Cases) or affiliates of Miller Buckfire and various of its officers and employees (some of which may include Miller Buckfire employees providing services in connection with the Chapter 11 Cases). The Managed Fund may invest from time to time in claims or securities of or relating to the Debtors or parties in interest in the Chapter 11 Cases. However, Miller Buckfire employees working in connection with the Debtors' Chapter 11 Cases have no control over or involvement in investment decisions or business decisions made for the Managed Fund. The fund managers of the Managed Fund maintain investment control over investment decisions. In addition, no confidential information concerning the Debtors is permitted to be communicated to any persons working for the manager of the Managed Fund. Miller Buckfire does not believe that the relationships outlined above constitute adverse interests or render Miller Buckfire not disinterested in the Chapter 11 Cases.

12. A number of business executives are members of an informal strategic advisory

committee (the "Strategic Committee") of MB Advisory, which is the parent company of Miller Buckfire. The Strategic Committee is an informal group of business executives who have agreed to consult with and advise Miller Buckfire's parent generally on the strategic direction of the Miller Buckfire company group and future business trends. The members of the Strategic Committee have no direct financial stake in Miler Buckfire engagements and no role in the management of Miller Buckfire. They have not been consulted concerning any matter relating to the Debtors' Chapter 11 Cases, nor will they be so consulted in the future. Members of the Strategic Committee, and entities for whom they work, may have relationships with creditors or other parties in interest in these Cases. However, in light of the limited role of the Strategic Committee (and the fact that its members play no role in these Cases), Miller Buckfire is not collecting and providing detailed information regarding such possible relationships.

13.     As part of its diverse practice, Miller Buckfire appears in numerous cases, proceedings and transactions involving many different attorneys, accountants, investment bankers and financial consultants, some of whom may represent claimants and parties in interest in these Chapter 11 Cases. Further, Miller Buckfire has in the past, and may in the future, be represented by several attorneys and law firms, some of whom may be involved in these proceedings. In addition, Miller Buckfire has been in the past, and likely will be in the future, engaged in matters unrelated to the Debtors or these Chapter 11 Cases in which it works with or against other professionals involved in these cases. Based on our current knowledge of the professionals involved in these Chapter 11 Cases, and to the best of my knowledge, none of these business relations constitute interests adverse to the Debtors.

14.     To the best of my knowledge and belief, insofar as I have been able to ascertain

after reasonable inquiry, neither I nor Miller Buckfire nor any of its professional employees has any connection with the Debtors, their creditors, the U.S. Trustee or any other Potential Parties in Interest in these Chapter 11 Cases or their respective attorneys or accounts, except as follows:

    a.    The Debtors have many creditors. From time to time, Miller Buckfire may perform or may have performed services for, or maintained other commercial or professional relationships with, certain creditors of the Debtors and various other parties that are adverse to the Debtors, in each case in matters unrelated to these Cases.

    b.    Miller Buckfire has been in the past, and in some cases is currently, involved in unrelated matters with certain creditors of the Debtors, including, but not limited to, ABRY Partners, GE Capital Corporation, Goldman Sachs Group, Inc., Barclay's Capital, and their respective affiliates, among others.

    c.    An associate of Miller Buckfire was a former employee of Levine Leichtman Capital Partners, which is a secured lender to the Debtors through one of its affiliates. The Miller Buckfire associate is not involved in the Chapter 11 Cases and is no longer affiliated with Levine Leichtman Capital Partners.

    d.    From time to time, Miller Buckfire also may have had dealings (either as co-advisers or in another capacity) on other unrelated matters with certain of the other professionals who are providing, or are expected to provide services in these Cases, including, without limitation:

        (i)    Curtis, Mallet-Prevost, Colt & Mosle LLP;

        (ii)    Zolfo Cooper;

        (iii)    Kirkland & Ellis LLP;

        (iv)    Richards, Layton & Finger; and

        (v)    CRG Partners.

15.     To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, Miller Buckfire has not been retained to assist any entity or person other than the Debtors on matters relating to, or in direct connection with, these Chapter 11 Cases. If Miller Buckfire's proposed retention by the Debtors is approved by the Court,

Miller Buckfire will not accept any engagement or perform any service for any entity or person other than the Debtors in these Cases. Miller Buckfire will, however, continue to provide professional service to entities or persons that may be creditors of the Debtors or parties-in-interest in these Cases, provided that such services do not relate to, or have any direct connection with, these Cases or the Debtors.

16. Insofar as I have been able to determine after reasonable inquiry, Miller Buckfire and the employees of Miller Buckfire that will work on this engagement do not hold or represent any interest adverse to the Debtors or their estates, and Miller Buckfire is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, in that Miller Buckfire, its professionals and employees:

are not creditors, equity security holders or insiders of the Debtors;

were not, within two years before the date of filing of the Debtors' Chapter 11 petitions, a director, officer, or employee of the Debtors; and

do not have an interest materially adverse to the Debtors, their respective estates, or any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in the Debtors, or for any other reason.

17. I am not related or connected to and, to the best of my knowledge after reasonable inquiry, no other professional of Miller Buckfire who will work on this engagement is related or connected to, any United States Bankruptcy Judge for the District of Delaware, any of the District Judges for the District of Delaware, the United States Trustee for this Region, or any employee in the Office of the United States Trustee for this Region.

18. To the best of my knowledge and belief, insofar as I have been able to ascertain after reasonable inquiry, none of the employees of Miller Buckfire working on this engagement

on the Debtors' behalf has had, or will have in the future, direct contact concerning these Cases with the Debtors' creditors, other parties in interest, the U.S. Trustee, or anyone employed in the Office of the United States Trustee other than in connection with performing financial advisory and investment banking services on behalf of the Debtors.

19. If Miller Buckfire discovers any additional information that requires disclosure, Miller Buckfire will promptly file a supplemental declaration with the Court.

## SCOPE OF SERVICES

20. In accordance with the terms of the Engagement Letter, at the request and direction of the Debtors, Miller Buckfire will perform the following investment banking services, among others, to the extent they are desired or necessary: [3]

    a. familiarize itself with the business, operations, properties, financial - condition and prospects of the Debtors;

    b. provide general financial advisory and investment services, including, if the Debtors determine to undertake a Restructuring, Financing and/or Sale, advising and assisting the Debtors in structuring and effecting the financial aspects of such a transaction or transactions;

    c. provide financial advice and assistance to the Debtors in developing and seeking approval of a plan of reorganization;

    d. provide financial advice and assistance to the Debtors in structuring any new securities to be issued under a plan of reorganization;

    e. assist the Debtors and/or participate in negotiations with entities or groups affected by a plan of reorganization;

    f. participate in hearings before the Bankruptcy Court with respect to the matters upon which Miller Buckfire has provided advice, including, as

---

[3] The description of the Engagement Letter is a summary. To the extent that this summary and the terms of the of the Engagement Letter are inconsistent, the terms of the Engagement Letter control. Capitalized terms used in this summary but not defined herein shall have the meanings ascribed to such terms in the Engagement Letter.

5091208

relevant, coordinating with the Debtors' counsel with respect to testimony in connection therewith;

g. assist the Debtors and/or participate in negotiations with potential Investors;

h. provide financial advice and assistance to the Debtors in connection with a Sale, identify potential acquirers and, at the Debtors' request, contact such potential acquirers; and

i. assist the Debtors and/or participate in negotiations with potential acquirers.

21. Miller Buckfire's advice and services will maximize the value of the Debtors estates. All of the services that Miller Buckfire will provide to the Debtors will be undertaken at the request of the Debtors and will be appropriately directed by the Debtors so as to avoid duplicative efforts among the professionals retained in the case, including Zolfo Cooper ("Zolfo"), with respect to whom the Debtors will seek approval of their agreement, pursuant to which Zolfo has agreed to provide JCharles Carnaval to serve as the Debtors' Chief Restructuring Officer and Interim CEO, and additional temporary staff. Miller Buckfire and Zolfo are being retained to perform distinct functions. Miller Buckfire is being retained to provide general financial advisory and investment banking services, including structuring, evaluating and assisting with the consummation of a financial restructuring and any related financing(s) and/or sale transaction(s), while Zolfo is being retained to evaluate, oversee, and assist the Debtor in its operational restructuring. Miller Buckfire will use reasonable efforts to coordinate with Zolfo and the Debtors' other retained professionals to avoid the unnecessary duplication of services.

## PROFESSIONAL COMPENSATION

22. The terms of Miller Buckfire's proposed compensation are fully set forth in the

Engagement Letter (the "Fee Structure"), a copy of which is annexed to the Application as Exhibit B. In summary, under the terms of the Engagement Letter and subject to the Court's approval, Miller Buckfire will receive

    a.    Monthly Advisory Fee. A Monthly Advisory Fee of $150,000 per month; provided that fifty percent (50%) of all Monthly Advisory Fees paid to Miller Buckfire beginning in February 2009 and (100%) of all Monthly Financial Advisory Fees paid to Miller Buckfire beginning in October 2009 (to the extent applicable) will be credited (without duplication) against any Restructuring Transaction Fee, Sale Transaction Fee or Financing Fee payable to Miller Buckfire pursuant to the Engagement Letter.

    b.    Restructuring Transaction Fee. If the Debtors consummate a Restructuring Transaction, Miller Buckfire is entitled to a Restructuring Transaction Fee of $1,600,000, payable at the closing of such Restructuring Transaction.

    c.    Sale Transaction Fee. If the Debtors consummate a Sale, Miller Buckfire is entitled to a Sale Transaction Fee of $1,600,000, payable at the closing of such Sale.

    d.    Higher of Fees: If the Debtors consummate a Sale and a Restructuring, Miller Buckfire shall receive the higher of the applicable Sale Transaction Fee and Restructuring Transaction Fee, but in no event shall receive both fees.

23.     Additionally, the Debtors have agreed to reimburse Miller Buckfire for its reasonable expenses incurred in connection with the provision of services, such as travel and other reasonable out-of-pocket expenses (including all reasonable fees, disbursements and other charges of Miller Buckfire's counsel).

24.     Miller Buckfire has obtained valuable institutional knowledge of the Debtors' businesses and financial affairs as a result of providing services to the Debtors prior to the Petition Date. Miller Buckfire submits that it is both well qualified and uniquely able to perform these services and assist the Debtors in these chapter 11 cases. Moreover, Miller Buckfire believes that its services will assist the Debtors in a successful outcome of these Cases.

5091208

25.     The Fee Structure is consistent with Miller Buckfire's normal and customary billing practices for comparably sized and complex cases, both in- and out-of-court, involving the services to be provided in these cases.    Miller Buckfire believes that the foregoing compensation arrangements are both reasonable and market-based.

26.     To induce Miller Buckfire to do business with the Debtors in bankruptcy, the compensation structure described above was established to reflect the difficulty of the extensive assignments Miller Buckfire expects to undertake and the potential for failure.

27.     Although Miller Buckfire does not charge for its services on an hourly basis, Miller Buckfire will maintain records in support of any actual and necessary costs and expenses incurred in connection with the rendering of its services in these cases.  Miller Buckfire requests that it be permitted to file time records in one half (.5) hour increments.   Miller Buckfire is seeking a waiver, pursuant to Local Rule 2016-2(g) of the requirement to bill activities in one-tenths (.1) of an hour.

28.     Miller Buckfire's strategic and financial expertise as well as its capital markets knowledge, financing skills, restructuring capabilities and mergers and acquisitions expertise, some or all of which may be required by the Debtors during the term of Miller Buckfire's engagement hereunder, were important factors in determining the Fee Structure.  Miller Buckfire believes that the ultimate benefit to the Debtors of Miller Buckfire's services hereunder cannot be measured by reference to the number of hours to be expended by Miller Buckfire's professionals in the performance of such services.

29.     In addition, the Fee Structure has been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of Miller Buckfire

and its professionals hereunder, and in the light of the fact that such commitment may foreclose other opportunities for Miller Buckfire and that the actual time and commitment required of Miller Buckfire and its professionals to perform its services hereunder may vary substantially from week to week or month to month.

30.     In sum, in the light of the foregoing and given the numerous issues which Miller Buckfire may be required to address in the performance of its services hereunder, Miller Buckfire's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Miller Buckfire's services for engagements of this nature both out-of-court and in a chapter 11 context, Miller Buckfire believes that the Fee Structure is market-based and fair and reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.

31.     Accordingly, as more fully described below, Miller Buckfire believes that the Court should approve Miller Buckfire's retention subject to the standard of review set forth in section 328(a) of the Bankruptcy Code and that Miller Buckfire's compensation should not be subject to any additional standard of review under section 330 of the Bankruptcy Code.

32.     Miller Buckfire has not shared or agreed to share any of its compensation from the Debtors with any other person, other than as permitted by section 504 of the Bankruptcy Code.

## INDEMNIFICATION AND LIMITATION OF LIABILITY

33.     The Engagement Letter further provides that the Debtors will indemnify, hold harmless and defend Miller Buckfire and its affiliates and its respective directors, officers, members, managers, shareholders, employees, agents and controlling persons and its respective

successors and assigns (collectively, the "<u>Indemnified Parties</u>") under certain circumstances (such indemnification obligation being referred to as the "<u>Indemnification Provisions</u>"), which provisions are attached to and made a part of the Engagement Letter. These are standard provisions, both in chapter 11 cases and outside chapter 11, and, as modified by the proposed retention order, reflect the qualifications and limits on the indemnification provisions that are customary in Delaware and other jurisdictions.

34.     Miller Buckfire believes that the Indemnification Provisions are customary and reasonable for financial advisory and investment banking engagements, both out-of-court and in chapter 11 cases. The Indemnification Provisions are similar to other indemnification provisions that have been approved by this Court and other bankruptcy courts.

35.     The terms and conditions of the Engagement Letter, including the Indemnification Provisions, were negotiated by the Debtors and Miller Buckfire at arm's length and in good faith.

*[Remainder of Page Left Intentionally Blank.]*

Miller Buckfire submits that the Indemnification Provisions contained in the Engagement Letter, viewed in conjunction with the other terms of Miller Buckfire's proposed retention, are reasonable.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

MILLER BUCKFIRE & CO., LLC

Executed on August 4, 2009

By: _____
Name: Samuel Greene
Title: Managing Director

Sworn to before me this
4th day of August 2009

_____
Notary Public
My Commission Expires on Nov. 1 2012

MICHELLE NUNNS
Notary Public, State of New York
No. 01NU6117939
Qualified in New York Count···
Commission Expires Novembei

# **EXHIBIT C**

## **Engagement Letter**



Miller Buckfire & Co., LLC
153 East 53rd Street, 22nd Floor
New York, NY 10022
Phone: 212-895-1800
Fax: 212-895-1850
www.millerbuckfire.com

September 26, 2008

Cygnus Business Media, Inc.
2 University Plaza
Hackensack, NJ 07601

Attention:    James Ogle
              Chief Financial Officer

Dear James:

This letter agreement confirms the terms under which Cygnus Business Media, Inc. (the "Company") has engaged Miller Buckfire & Co., LLC ("Miller Buckfire") on an exclusive basis as its investment banker with respect to a possible Restructuring, Financing and/or Sale (each as defined below) and with respect to such other financial matters as to which the Company and Miller Buckfire may agree in writing during the term of this engagement. For purposes hereof, the term "Company" includes affiliates of the Company and any entity that the Company or its affiliates may form or invest in to consummate a Restructuring, Financing and/or Sale, and shall also include any successor to or assignee of all or a portion of the assets and/or businesses of the Company whether pursuant to a Plan (as defined below) or otherwise. If appropriate in connection with performing its services for the Company hereunder, Miller Buckfire may utilize the services of one or more of its affiliates, in which case references herein to Miller Buckfire shall include such affiliates.

1.    Miller Buckfire, as exclusive investment banker to the Company, will perform the following investment banking services:

    a.    <u>General Investment Banking Services</u>. Miller Buckfire will:

        i.    to the extent it deems necessary, appropriate and feasible, familiarize itself with the business, operations, properties, financial condition and prospects of the Company; and

        ii.   if the Company determines to undertake a Restructuring, Financing and/or Sale advise and assist the Company in structuring and effecting the financial aspects of such a transaction or transactions, subject to the terms and conditions of this agreement.

    b.    <u>Restructuring Services</u>. If the Company pursues a Restructuring, Miller Buckfire will:

        i.    provide financial advice and assistance to the Company in developing and seeking approval of a Restructuring plan (as the same may be modified from time to time, a "Plan"), which may be

a plan under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code");

ii.   if requested by the Company, in connection therewith, provide financial advice and assistance to the Company in structuring any new securities to be issued under the Plan;

iii.   if requested by the Company, assist the Company and/or participate in negotiations with entities or groups affected by the Plan; and

iv.   if requested by the Company, participate in hearings before the bankruptcy court with respect to the matters upon which Miller Buckfire has provided advice, including, as relevant, coordinating with the Company's counsel with respect to testimony in connection therewith.

For purposes of this agreement, the term "Restructuring" shall mean any recapitalization or restructuring (including, without limitation, through any exchange, conversion, cancellation, forgiveness, retirement and/or a material modification or amendment to the terms, conditions or covenants thereof) of the Company's preferred equity and/or debt securities and/or other indebtedness, obligations or liabilities (including preferred stock, partnership interests, lease obligations, trade credit facilities and/or contract or tort obligations), including pursuant to a repurchase or an exchange transaction, a Plan or a solicitation of consents, waivers, acceptances or authorizations.

c.   Financing Services. If the Company pursues a Financing, Miller Buckfire will:

i.   provide financial advice and assistance to the Company in structuring and effecting a Financing, identify potential Investors (as defined below) and, at the Company's request, contact such Investors;

ii.   if Miller Buckfire and the Company deem it advisable, assist the Company in developing and preparing a memorandum (with any amendments or supplements thereto, the "Financing Offering Memorandum") to be used in soliciting potential Investors, it being agreed that (A) the Financing Offering Memorandum shall be based entirely upon information supplied by the Company, (B) the Company shall be solely responsible for the accuracy and completeness of the Financing Offering Memorandum, and (C) other than as contemplated by this subparagraph (c)(ii), the Financing Offering Memorandum shall not be used, reproduced, disseminated, quoted or referred to at any time in any way, except with Miller Buckfire's prior written consent; and

      iii.    if requested by the Company, assist the Company and/or participate in negotiations with potential Investors.

For purposes of this agreement, the term "Financing" shall mean a private issuance, sale or placement of the equity, equity-linked or debt securities, instruments or obligations of the Company with one or more lenders and/or investors except to the extent issued to existing security holders of the Company in exchange for their existing securities, or any loan or other financing, including any "debtor in possession financing" or "exit financing" in connection with a case under the Bankruptcy Code or a rights offering (each such lender or investor, an "Investor").

It is understood and agreed that nothing contained herein shall constitute an expressed or implied commitment by Miller Buckfire to act in any capacity or to underwrite, place or purchase any financing or securities, which commitment shall only be set forth in a separate underwriting, placement agency or other appropriate agreement relating to the Financing.

    d.    <u>Sale Services</u>. If the Company pursues a Sale, Miller Buckfire will:

      i.    provide financial advice and assistance to the Company in connection with a Sale, identify potential acquirors and, at the Company's request, contact such potential acquirors;

      ii.    at the Company's request, assist the Company in preparing a memorandum (with any amendments or supplements thereto, the "Sale Memorandum") to be used in soliciting potential acquirors, it being agreed that (A) the Sale Memorandum shall be based entirely upon information supplied by the Company, (B) the Company shall be solely responsible for the accuracy and completeness of the Sale Memorandum, and (C) other than as contemplated by this subparagraph (d)(ii), the Sale Memorandum shall not be used, reproduced, disseminated, quoted or referred to at any time in any way, except with Miller Buckfire's prior written consent; and

      iii.    if requested by the Company, assist the Company and/or participate in negotiations with potential acquirors.

For purposes of this agreement, the term "Sale" shall mean the disposition to one or more third parties in one or a series of related transactions of (x) all or substantially all of the equity securities of the Company by the security holders of the Company or (y) all or substantially all the assets (including the assignment of any executory contracts) or businesses of the Company or its subsidiaries, in either case, including through a sale or exchange of capital stock, options or assets, a lease of assets with or without a purchase option, a merger, consolidation or other business combination, an exchange or tender offer, a recapitalization, the formation of a joint venture, partnership or similar entity, or any similar transaction.

In rendering its services to the Company hereunder, Miller Buckfire is not assuming any responsibility for the Company's underlying business decision to pursue or not to pursue any business strategy or to effect or not to effect any Restructuring, Financing, and/or Sale or other transaction. The Company agrees that Miller Buckfire shall not have any obligation or responsibility to provide accounting, audit, "crisis management," or business consultant services for the Company and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements, or to provide any fairness or valuation opinions or any advice or opinions with respect to solvency in connection with any transaction. The Company confirms that it will rely on its own counsel, accountants and similar expert advisors for legal, accounting, tax and other similar advice.

In order to coordinate effectively the Company's and Miller Buckfire's activities to effect a Restructuring, Financing or Sale, the Company will promptly inform Miller Buckfire of any discussions, negotiations or inquiries regarding a possible Restructuring, Financing or Sale (including any such discussions, negotiations or inquiries that have occurred in the six month period prior to the date of this agreement).

The Company shall make available to Miller Buckfire all information concerning the business, assets, operations, financial condition and prospects of the Company that Miller Buckfire reasonably requests in connection with the services to be performed for the Company hereunder and shall provide Miller Buckfire with reasonable access to the Company's officers, directors, employees, independent accountants and other advisors and agents as Miller Buckfire shall deem appropriate. The Company represents that all information furnished by it or on its behalf to Miller Buckfire (including information contained in any Financing Offering Memorandum and/or Sale Memorandum) will be accurate and complete in all material respects. The Company recognizes and confirms that in advising the Company and completing its engagement hereunder, Miller Buckfire will be using and relying on publicly available information and on data, material and other information furnished to Miller Buckfire by the Company and other parties. It is understood that in performing under this engagement Miller Buckfire may assume and rely upon the accuracy and completeness of, and is not assuming any responsibility for independent verification of, such publicly available information and the other information so furnished.

2.    Miller Buckfire's compensation for services rendered under this agreement will consist of the following cash fees:

a.    A monthly advisory fee of $150,000 (the "Monthly Advisory Fee"), which shall be due and paid by the Company beginning October 1, 2008 and thereafter on each monthly anniversary thereof until the earlier of: (i) the termination of this letter agreement pursuant to the provisions hereof, and (ii) the consummation of a Restructuring or a Sale. One half each Monthly Advisory Fee ($75,000) paid in respect of any months following the fourth month of this engagement and each Monthly Advisory Fee paid in respect of any months following the twelfth month of this engagement

shall be credited (without duplication) against any Restructuring Transaction Fee, Sale Transaction Fee or Financing fee.

b.    If at any time during the term of this engagement or within the twelve full months following the termination of this engagement (including the term of this engagement, the "Fee Period"), (x) any Restructuring is consummated or (y)(1) an agreement in principle, definitive agreement or Plan to effect a Restructuring is entered into and (2) concurrently therewith or at any time thereafter (including following the expiration of the Fee Period), any Restructuring is consummated, Miller Buckfire shall be entitled to receive a transaction fee (a "Restructuring Transaction Fee"), contingent upon the consummation of a Restructuring and payable at the closing thereof, equal to $1,600,000.

c.    If at any time during the Fee Period, (x) any Sale is consummated or (y)(1) an agreement in principle or definitive agreement to effect a Sale is entered into, and (2) concurrently therewith or at any time thereafter (including following the expiration of the Fee Period) any Sale is consummated, Miller Buckfire shall be entitled to receive a transaction fee (a "Sale Transaction Fee"), contingent upon the consummation of a Sale and payable at the closing thereof, which shall be equal to $1,600,000; provided, however, that if the Company consummates a Sale to Wasserstein & Co. and/or its affiliates on or prior to the 120th day after the date hereof pursuant to an out-of-court transaction, then (i) the Sale Transaction Fee shall be $1,000,000 and (ii) notwithstanding the crediting provisions set forth in subparagraph 2(a) hereof, each Monthly Advisory Fee paid to Miller Buckfire shall be credited (but only once) against such Sale Transaction Fee. Notwithstanding anything to the contrary herein, the Monthly Advisory Fee shall cease to be due and payable upon actual receipt by Miller Buckfire of a Sale Transaction Fee and upon completion of Miller Buckfire's engagement hereunder.

d.    If at any time during the Fee Period, the Company obtains a written commitment for a debtor-in-possession Financing from an entity other than the Company's existing lenders (including, but not limited to General Electric Capital Corporation and Barclays Bank PLC) or any of their affiliates, Miller Buckfire shall be entitled to receive a financing fee of 0.50% of the aggregate amount of such commitment, which fee shall be due and payable at the signing of such commitment.

Each party hereto acknowledges and agrees that Miller Buckfire's restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required during the term of Miller Buckfire's engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit of Miller Buckfire's services hereunder could not be measured merely by reference to the number of hours to be expended by

Miller Buckfire's professionals in the performance of such services. Each party hereto also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of Miller Buckfire and that the actual time and commitment required of Miller Buckfire and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm. In addition, given the numerous issues with Miller Buckfire's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Miller Buckfire's services for engagements of this nature in an out-of-court context, each party hereto agrees that the fee and expense arrangements hereunder are reasonable under all applicable legal standards. In addition, the Company and Miller Buckfire acknowledge and agree that more than one fee may be payable to Miller Buckfire under subparagraphs 2(b), 2(c) and/or 2(d) hereof in connection with any single transaction or a series of transactions, it being understood and agreed that (i) if more than one fee becomes so payable to Miller Buckfire in connection with a series of transactions, each such fee shall be paid to Miller Buckfire and (ii) if more than one fee becomes so payable to Miller Buckfire in connection with a single transaction, the highest of such fees shall be paid to Miller Buckfire.

3.  In addition to any fees payable by the Company to Miller Buckfire hereunder, the Company shall, whether or not any transaction contemplated by this agreement shall be proposed or consummated, reimburse Miller Buckfire on a monthly basis for its travel and other reasonable out-of-pocket expenses incurred in connection with, or arising out of Miller Buckfire's activities under or contemplated by this engagement or in the enforcement of Miller Buckfire's rights hereunder (including all fees, disbursements and other charges of counsel to be retained by Miller Buckfire, and of other consultants and advisors retained by Miller Buckfire with the Company's consent). The Company shall also reimburse Miller Buckfire, at such times as Miller Buckfire shall request, for any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to or contemplated by, this engagement. Such reimbursements shall be made promptly upon submission by Miller Buckfire of statements for such expenses.

4.  The Company agrees to indemnify Miller Buckfire and certain related persons in accordance with the indemnification provisions ("Indemnification Provisions") attached to this agreement. Such Indemnification Provisions are an integral part of this agreement, and the terms thereof are incorporated by reference herein. Such Indemnification Provisions shall survive any termination or completion of Miller Buckfire's engagement hereunder.

5.  The Company agrees that none of Miller Buckfire, its affiliates or their respective directors, officers, members, managers, agents, employees and controlling persons, or any of their respective successors or assigns ("Covered Persons") shall have any liability to the Company or any person asserting claims on behalf of the Company or in the Company's right for or in connection with this engagement or any

transactions or conduct in connection therewith except for losses, claims, damages, liabilities or expenses incurred by the Company which are finally judicially determined to have resulted primarily from the gross negligence or willful misconduct of such Covered Person.

6.  This agreement and Miller Buckfire's engagement hereunder may be terminated by either the Company or Miller Buckfire at any time, upon prior written notice thereof to the other party; provided, however, that (a) termination of Miller Buckfire's engagement hereunder shall not affect the Company's continuing obligation to indemnify Miller Buckfire and certain related persons as provided for in this agreement, and its continuing obligations and agreements under paragraphs 5 and 7 hereof, (b) notwithstanding any such termination, Miller Buckfire shall be entitled to the full fees in the amounts and at the times provided for in paragraph 2 hereof and (c) any termination of Miller Buckfire's engagement hereunder shall not affect the Company's obligation to reimburse expenses accruing prior to such termination to the extent provided in paragraph 3 hereof.

7.  Miller Buckfire has been retained under this agreement as an independent contractor with no fiduciary or with no agency relation to the Company or to any other party, it being understood that Miller Buckfire shall have no authority to bind, represent or otherwise act as agent, executor, administrator, trustee, lawyer or guardian for the Company. The advice (oral or written) rendered by Miller Buckfire pursuant to this agreement is intended solely for the benefit and use of the Board of Directors of the Company in considering the matters to which this agreement relates, and the Company agrees that such advice may not be relied upon by any other person or entity, used for any other purpose or reproduced, disseminated, quoted or referred to at any time, in any manner for any purpose, nor shall any public references to Miller Buckfire be made by the Company, without the prior written consent of Miller Buckfire.

8.  The Company agrees that Miller Buckfire shall have the right to place advertisements in financial and other newspapers and journals at its own expense describing its services to the Company hereunder; provided that Miller Buckfire will submit a copy of any such advertisement to the Company for its approval, which approval shall not be unreasonably withheld or delayed and in no event shall any advertisement with respect to the Restructuring, Financing or Sale be made prior to the consummation of the applicable Restructuring, Financing or Sale.

9.  This agreement shall be deemed to be made in New York. This agreement and all controversies arising from or relating to performance of this agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to such state's rules concerning conflicts of laws that might provide for any other choice of law. The Company hereby irrevocably consents to personal jurisdiction in the Supreme Court of the State of New York in New York County, Commercial Part, or any Federal court sitting in

the Southern District of New York for the purposes of any suit, action or other proceeding arising out of this agreement or any of the agreements or transactions contemplated hereby, which is brought by or against the Company, hereby waives any objection to venue with respect thereto, and hereby agrees that all claims in respect of any such suit, action or proceeding shall be heard and determined in any such court, and that such courts shall have exclusive jurisdiction over any claims arising out of or relating to such agreements or transactions; provided that in the event that the Company becomes a debtor under chapter 11 of the Bankruptcy Code, during any such case, any such claims may also be heard and determined in the Bankruptcy Court (as defined below). The Company hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the Company at its address set forth above, such service to become effective ten (10) days after such mailing. ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION ARISING OUT OF THIS AGREEMENT OR CONDUCT IN CONNECTION WITH MILLER BUCKFIRE'S ENGAGEMENT IS HEREBY WAIVED.

10. This agreement may be executed in counterparts, each of which together shall be considered a single document. This agreement shall be binding upon Miller Buckfire and the Company and their respective successors and assigns (including, in the case of the Company, any successor to all or a portion of the assets and/or the businesses of the Company under a Plan). This agreement is not intended to confer any rights upon any shareholder, creditor, owner or partner of the Company, or any other person or entity not a party hereto other than the indemnified persons referenced in the Indemnification Provisions contained herein and the Covered Persons referenced above. This agreement (including the Indemnification Provisions) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this agreement is determined to be invalid or unenforceable in any respect, such determination will not affect the agreement in any other respect, which will remain in full force and effect. No waiver, amendment or other modification of this agreement shall be effective unless in writing and signed by each party to be bound thereby.

11. The Company does not appear on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury, nor is it a prohibited party according to other U.S. government regulatory or enforcement agencies.

12. The Company hereby acknowledges that affiliates of Miller Buckfire engage in the hedge fund and/or principal investment business, which affiliates are separated by ethical walls to prevent the improper sharing of client information. The Company hereby acknowledges and agrees that such affiliates may from time to time have a long or short position in, buy and sell or otherwise effect transactions for their own accounts or for the accounts of investment pools managed by them in the

securities, loans or other obligations or instruments of the Company or those of other companies or entities so long as the personnel involved in performing such activities have not received access to the Company's confidential information from Miller Buckfire.

13. In the event that the Company becomes a debtor under chapter 11 of the Bankruptcy Code, the Company shall apply promptly to the bankruptcy court having jurisdiction over the chapter 11 case or cases (the "<u>Bankruptcy Court</u>") for the approval pursuant to sections 327(a) and 328(a) of the Bankruptcy Code of this agreement and Miller Buckfire's retention by the Company under the terms of this agreement, subject only to the standard of review provided for in Section 328(a) of the Bankruptcy Code, and not subject to the standard of review under section 330 of the Bankruptcy Code or any other standard of review, and shall use its best efforts to obtain Bankruptcy Court authorization thereof. The Company shall supply Miller Buckfire and its counsel with a draft of such application and the proposed order authorizing Miller Buckfire's retention that is proposed to be submitted to the Bankruptcy Court sufficiently in advance of the filing of such application or the submission of such order, as the case may be, to enable Miller Buckfire and its counsel to review and comment thereon. Miller Buckfire shall have no obligation to provide any services under this agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless Miller Buckfire's retention under the terms of this agreement is approved under Section 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which order is acceptable to Miller Buckfire in all respects. Miller Buckfire acknowledges that in the event that the Bankruptcy Court approves its retention by the Company pursuant to the application process described in this paragraph 12, payment of Miller Buckfire's fees and expenses shall be subject to (i) the jurisdiction and approval of the Bankruptcy Court under Section 328(a) of the Bankruptcy Code and any order approving Miller Buckfire's retention, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interim and final fee applications. In the event that the Company becomes a debtor under the Bankruptcy Code and Miller Buckfire's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of Miller Buckfire hereunder as promptly as practicable in accordance with the terms hereof. In so agreeing to seek Miller Buckfire's retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that Miller Buckfire's experience and expertise, its knowledge of the industry in which the Company operates and the capital markets and its other capabilities will inure to the benefit of the Company, that the value to the Company of Miller Buckfire's services hereunder derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the fees payable to Miller Buckfire hereunder are reasonable regardless of the number of hours to be expended by Miller Buckfire's professionals in performance of the services to be provided hereunder. Prior to commencing a chapter 11 case,

the Company shall pay all undisputed amounts theretofore due and payable to Miller Buckfire in cash.

14. We are pleased to accept this engagement and look forward to working with the Company. Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed duplicate of this letter, which shall thereupon constitute a binding agreement between Miller Buckfire and the Company.

Very truly yours,

MILLER BUCKFIRE & CO., LLC

By: _____

Name: Samuel M. Greene
Title: Managing Director


Accepted and Agreed to:

CYGNUS BUSINESS MEDIA, INC.

By: _____

Name: James Ogle
Title: Chief Financial Officer

# INDEMNIFICATION PROVISIONS

In connection with the engagement of Miller Buckfire & Co., LLC ("Miller Buckfire") as investment banker to Cygnus Business Media, Inc., the Company hereby agrees to indemnify and hold harmless Miller Buckfire and its affiliates, their respective directors, officers, members, managers, agents, employees and controlling persons, and each of their respective successors and assigns (collectively, the "indemnified persons"), to the full extent lawful, from and against all losses, claims, damages, liabilities and expenses incurred by them which (A) are related to or arise out of (i) actions or alleged actions taken or omitted to be taken (including any untrue statements made or any statements omitted to be made) by the Company or (ii) actions or alleged actions taken or omitted to be taken by an indemnified person with the Company's consent or in conformity with the Company's actions or omissions or (B) are otherwise related to or arise out of Miller Buckfire's activities under Miller Buckfire's engagement. The Company will not be responsible, however, for any losses, claims, damages, liabilities or expenses pursuant to clause (B) of the preceding sentence which are finally judicially determined to have resulted primarily from the gross negligence or willful misconduct of the person seeking indemnification hereunder. For purposes of these indemnification provisions, the term the "Company" has the meaning set forth in the engagement letter, dated as of September 26, 2008, between Miller Buckfire and Cygnus Business Media, Inc., of which these indemnification provisions are an integral part.

After receipt by an indemnified person of notice of any complaint or the commencement of any action or proceeding with respect to which indemnification is being sought hereunder, such person will notify the Company in writing of such complaint or of the commencement of such action or proceeding, but failure so to notify the Company will relieve the Company from any liability which the Company may have hereunder only if, and to the extent that such failure results in the forfeiture by the Company of substantial rights and defenses, and will not in any event relieve the Company from any other obligation or liability that the Company may have to any indemnified person otherwise than under these indemnification provisions. If the Company so elects or is requested by such indemnified person, the Company will assume the defense of such action or proceeding, including the employment of counsel reasonably satisfactory to Miller Buckfire and the payment of the fees and disbursements of such counsel. In the event, however, such indemnified person reasonably determines in its judgment that having common counsel would present such counsel with a conflict of interest or if the defendants in, or targets of, any such action or proceeding include both an indemnified person and the Company, and such indemnified person reasonably concludes that there may be legal defenses available to it or other indemnified persons that are different from or in addition to those available to the Company, or if the Company fails to assume the defense of the action or proceeding or to employ counsel reasonably satisfactory to such indemnified person, in either case in a timely manner, then such indemnified person may employ separate counsel to represent or defend it in any such action or proceeding and the Company will pay the fees and disbursements of such counsel; provided, however, that the Company will not be required to pay the fees and disbursements of more than one separate counsel (in addition to local counsel) for all indemnified persons in any jurisdiction in any single action or proceeding. In any action or proceeding the defense of which the Company assumes, the indemnified person will have the right to participate in such litigation and to retain its own counsel at such indemnified person's own expense. The Company further agrees that it will not, without the prior written consent of Miller Buckfire, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not Miller Buckfire or any other indemnified person is an actual or potential party to such claim, action, suit or proceeding) unless such settlement, compromise or consent includes an unconditional release of Miller Buckfire and each other indemnified person hereunder from all liability arising out of such claim, action, suit or proceeding.

The Company agrees that if any indemnification sought by an indemnified person pursuant to these indemnification provisions is held by a court to be unavailable for any reason other than as specified in the second sentence of the first paragraph of these indemnification provisions, then (whether or not Miller Buckfire is the indemnified person), the Company and Miller Buckfire will contribute to the losses, claims, damages, liabilities and expenses for which such indemnification is held unavailable (i) in such proportion as is appropriate to reflect the relative benefits to the Company, on the one hand, and Miller Buckfire, on the other hand, in connection with Miller Buckfire's engagement referred to above, or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i), but also the relative fault of the Company, on the one hand, and Miller Buckfire, on the other hand, as well as any other relevant equitable considerations; provided however, that in any event the aggregate contribution of all indemnified persons, including Miller Buckfire, to all losses, claims, damages, liabilities and expenses with respect to which contribution is available hereunder will not exceed the amount of fees actually received by Miller Buckfire from the Company

pursuant to Miller Buckfire's engagement referred to above. It is hereby agreed that for purposes of this paragraph, the relative benefits to the Company, on the one hand, and Miller Buckfire, on the other hand, with respect to Miller Buckfire's engagement shall be deemed to be in the same proportion as (i) the total value paid or proposed to be paid or received by the Company or the Company's stockholders, claims holders or contract parties, as the case may be, pursuant to the transaction, whether or not consummated, for which Miller Buckfire is engaged to render investment banking services, bears to (ii) the fee paid or proposed to be paid to Miller Buckfire in connection with such engagement. It is agreed that it would not be just and equitable if contribution pursuant to this paragraph were determined by pro rata allocation or by any other method which does not take into account the considerations referred to in this paragraph.

The Company further agrees that it will promptly reimburse Miller Buckfire and any other indemnified person hereunder for all expenses (including fees and disbursements of counsel) as they are incurred by Miller Buckfire or such other indemnified person in connection with investigating, preparing for or defending, or providing evidence in, any pending or threatened action, claim, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not Miller Buckfire or any other indemnified person is a party) and in enforcing these indemnification provisions.

The Company's indemnity, contribution, reimbursement and other obligations under these indemnification provisions shall be in addition to any liability that the Company may otherwise have, at common law or otherwise, and shall be binding on the Company's successors and assigns.

Solely for purposes of enforcing these indemnification provisions, the Company hereby consents to personal jurisdiction, service and venue in any court in which any claim or proceeding which is subject to, or which may give rise to a claim for indemnification or contribution under, these indemnification provisions is brought against Miller Buckfire or any other indemnified person.

These indemnification provisions shall apply to the above-mentioned engagement, activities relating to the engagement occurring prior to the date hereof, and any subsequent modification of or amendment to such engagement, and shall remain in full force and effect following the completion or termination of Miller Buckfire's engagement.